UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| WE THE PATRIOTS USA, INC.; <br> COURTNEY FISH, *aka Courtney Miller;* <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY; MICHAEL STANLEY REGAN, in his official capacity only; MIKE DEWINE, in his official capacity only; ANNE M. VOGEL, in her official capacity only <br><br> Defendants. | Dkt. No. 4:23-cv-382 <br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br> February 27, 2023 |

## COMPLAINT

1. This is an action for declaratory and injunctive relief or, in the alternative, for a writ of mandamus against federal and Ohio officials for failing to take adequate steps to protect the public from the consequences of the toxic chemical spill that occurred in East Palestine, Ohio on February 3, 2023 and have committed affirmative acts that have placed the Plaintiffs in greater danger in violation of the Plaintiffs' Fourteenth Amendment rights.

## PARTIES

2. We The Patriots USA, Inc. is a nonprofit public charity organized and operated exclusively for tax-exempt purposes in accordance with Section 501(c)(3) of the Internal Revenue Code. More specifically, it is dedicated to promoting constitutional rights, environmental safety – especially the removal of radiological and chemical toxins,

and other freedoms through education, outreach, and public interest litigation, thereby advancing religious freedom, medical freedom, parental rights, educational freedom, and public safety for all. As a Section 501(c)(3) public charity, it has members who participate in its tax-exempt activities as volunteers and committed community stakeholders bringing and supporting litigation in federal and state courts on a variety of constitutional and other freedom-related matters directly affecting their rights and interests. Its members include Ohio and Pennsylvania residents affected by the matters complained of herein and share common claims to that brought by We The Patriots USA, Inc. in its representative capacity.

3. Courtney Fish (a.k.a. Courtney Miller) is an East Palestine, Ohio resident whose home is a mere 100 yards or so from the site of Norfolk Southern 32N's derailment.

4. The United States Environmental Protection Agency (EPA) is the federal agency charged with regulating and protecting environmental conditions in the United States. It has taken a substantial, if not a leading, role in the actions complained of herein.

5. Michael Stanley Regan is the administrator of the United States Environmental Protection Agency (EPA). He is sued in his official capacity only.

6. Mike DeWine is the governor of Ohio. He is sued in his official capacity only.

7. Anne M. Vogel is the director of Ohio's Environmental Protection Agency (OHEPA). She is sued in her official capacity only.

## JURISDICTION

8. The Court has jurisdiction over this matter pursuant to Fourteenth Amendment to the United States Constitution, 28 U.S.C. §§ 1331, 1651, and 2201, and

42 U.S.C. § 1983. Venue is proper because the majority of the events complained of herein occurred with the Northern District of Ohio.

## FACTUAL ALLEGATIONS

### *The Train Derailment*

9. On February 1, 2023, a Norfolk Southern freight train bearing the number 32N departed the Terminal Railroad Association of St. Louis trainyard in Madison, Illinois for Norfolk Southern's Conway Yard in Conway, Pennsylvania.

10. Upon information and belief, Norfolk Southern 32N was 1.76 miles long and consisted of approximately 141 loaded cars and 9 empty cars. Of those cars, 20 were loaded with toxic materials including chloroethene, butyl acrylate, 2-ethyhexyl acrylate, ethylene glycol monobutyl ether, isobutylene, and benzene residue.

11. On February 3, 2023 at approximately 8:55 PM Eastern Standard Time, Norfolk Southern 32N derailed and caught fire as it was passing through East Palestine, Ohio.

12. The derailment caused its toxic chemicals to spill into local waterways and water supplies.

13. Upon information and belief, Norfolk Southern 32N burned uncontrollably for three days (February 3-6, 2023), polluting the air with its toxic chemicals, including vinyl chloride.

14. The fire ultimately became so large that Pittsburgh, Pennsylvania weather radar detected the fire for several hours. It apparently reached its peak intensity around 10:40 P.M. when the smoke plume had travelled below Beaver Falls, Pennsylvania.

15. Weather radar reported a value of 31.5 decibels at approximately 10:40 PM, which is the equivalent of moderate rain/snow. The smoke plume was blown to the south and east due to a northwest wind that was blowing over the fire, and it traveled at least as far as Bridgewater Pennsylvania.

16. Officials issued a shelter-in-place order for the entire town of East Palestine, affecting roughly 5,000 people, and an evacuation order was put in effect within a mile of the train derailment at 1020 East Taggart Street as of early Saturday, February 4, 2023.

17. Upon information and belief, one tanker car carrying vinyl chloride became a focus of concern when its malfunctioning safety valves prevented the release of the chemical inside, meaning that pressure was building to unsafe levels inside the steel shell and could potentially cause a deadly explosion that would throw shrapnel for miles.

18. At approximately 4:30 PM on Monday, February 6, 2023, nearby residents were given as little as five minutes' notice that emergency crews would be blowing up several cars and conducting controlled burns of their chemicals.

19. This process is known as a controlled release, and it released a large plume of thick black smoke in the form of a mushroom cloud.

20. More critically, it dispersed toxic hydrogen chloride and phosphene gas into the atmosphere, polluting it with toxic chemicals. Notably, phosphene gas was used as a chemical weapon in World War 1.

21. The smoke from the "controlled release' was trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet. In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically. Instead, it began to spread out horizontally in a thick cloud.

22. The pollution encompassed an area at least 30 miles around the derailment site and affected both Ohio and Pennsylvania residents, who, upon information and belief, began to report noxious fumes, numbed tongues and lips from the derailment, fire, toxic chemical disbursement and subsequent explosion.

23. Nor was the damage limited to just the air. Upon information and belief, the chemicals from Norfolk Southern 32N made their way into many bodies of water, including local water sources.

***The Chemicals Possibly Released Into The Atmosphere And Local Water Sources***

24. Vinyl chloride was the primary toxic chemical released into the atmosphere by Norfolk Southern 32N and the subsequent "clean up". It is classified by the EPA as a Group A human carcinogen – the most dangerous category to human health. Human exposure to it can affect the cardiovascular, respiratory, and central nervous systems, and can cause death, difficulty breathing, lung irritation, chest pains, coughing, dizziness, headaches, eye irritation, and loss of consciousness.

25. Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects such as dizziness, drowsiness, disorientation, tingling, numbness or burning sensations of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, or even death.

26. Exposure to higher concentrations of vinyl chloride can cause death due to central nervous system and respiratory depression.

27. Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

28. Just one pound vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm – well above OSHA's prescribed standard for prolonged human exposure.

29. Upon information and belief, the train derailment and resulting toxic chemical explosion released approximately 1,000,000 pounds of vinyl chloride in the atmosphere.

30. Vinyl chloride, however, was not the only toxic chemical released in the atmosphere despite being the primary and most dangerous one.

31. Upon information and belief, butyl acrylate was also released. It yields many, if not all, of the same adverse health consequences as vinyl chloride.

32. The derailment and "controlled burn" also released ethylhexyl acrylate – a colorless liquid used to make paints and plastics. It can cause skin and respiratory irritation.

33. Benzene was released or spilled in the "controlled burn." It comes in a close second to vinyl chloride in terms of its toxicity. It is commonly described as a "mitotic poison" or a mutagen because of its irreversible binding to DNA, its inhibiting of DNA synthesis, and its operation to cause DNA strand breaks.

34. Benzene has a diabolical effect on the human body because it attacks human cells. For instance, it can inhibit bone marrow from producing enough red blood cells, which could lead to anemia. It also attacks the human immune system by changing the blood levels of antibodies and by causing the loss of white blood cells.

35. The effects of short-term exposure include drowsiness, dizziness, rapid or irregular heartbeat, headaches, tremors, confusion, and unconsciousness.

36. Benzene's long term effects are devastating. It affects primarily the blood, and, in addition to the cell inhibition described above, it can affect women's menstrual cycles and their fertility. It also can cause leukemia.

### *A Story of Avoidance*

37. After the train initially derailed, federal and state officials took initial precautionary steps.

38. On February 4, 2023, the United States and Ohio EPAs announced that they would respond to the derailment site in East Palestine, Ohio, and the EPA began air monitoring for volatile organic compounds (VOCs), including vinyl chloride and butyl acrylate.

39. Both EPAs used contractors to install various devices such as booms and underflow dams to restrict the flow of contaminated water.

40. On February 5, 2023, Defendant DeWine activated the Ohio National Guard to assist East Palestine authorities. Officials then issued a shelter-in-place order for the entire town of East Palestine and an evacuation order for people living within a mile radius of the train crash because of the risk of an explosion.

41. At this juncture, the EPAs reported that their community air monitoring readings did not detect any contaminants of concern. They also reported that the East Palestine water treatment plant confirmed that its water was not contaminated.

42. While sound in theory, these preliminary steps unraveled quickly on February 6, 2023 before, during, and after the "controlled burn."

43. On February 7, 2023, both EPAs informed the public that they might smell chemical odors, but that it was no cause for concern because the released contaminants had low odor thresholds. In other words, a person could smell them before they posed a serious health risk.

44. This statement was blatantly inaccurate and was designed to do nothing more than to deal with burgeoning public and political pressure.

45. In fact, air monitoring teams quickly turned tail and ran when they smelled chemicals during a Valentine's Day inspection.[1]

46. By February 8, 2023, state officials lifted the evacuation order after both EPAs reported that their overnight water testing showed that it was safe to drink and uncontaminated.

47. Upon information and belief, the Defendants used East Palestine fire chief Keith Drabick to state this conclusion in a press conference instead of delivering the news themselves.

48. Despite this assessment, both EPAs continued to conduct stationary and roaming air monitoring around the derailment site.

---

[1] https://www.nytimes.com/2023/02/19/us/politics/east-palestine-toxic-chemicals-epa.html

49. Matters changed on February 10. Residents returning to their homes began to report rashes, sore throats, nausea, and headaches within 30 minutes of returning home.[2]

50. The Defendants and their subordinates, however, brushed these reports off as individual sensitivities to chemicals instead of a sign of a broader problem. They, however, knew that this was a false assurance because, as explained hereinafter, their testing was woefully inadequate.

51. On February 14, 2023, the Defendants moved into downplaying mode. Both EPAs discontinued their phosgene and hydrogen chloride community air monitoring, but they continued 24-hour community air monitoring for other chemicals.

52. On February 15, 2023, Defendant DeWine issued a press release stating that East Palestine water was safe to drink according to the OHEPA.[3]

53. Despite this statement, the Defendants did not inform the public that potentially contaminated soil had yet to be removed and could still pose a risk of contamination of their drinking water.

54. On February 16, 2023, Defendant Regan arrived in East Palestine, ostensibly to meet with local officials about the response to the derailment. The real purpose of his visit became clear though when he and Defendant DeWine made a mockery of Ohio citizens by ceremoniously toasting a homeowner with water from her tap.

---

[2] East Palestine residents worry rashes, headaches and other symptoms may be tied to chemicals from train crash | CNN
[3] East Palestine Water Quality Update | Governor Mike DeWine (ohio.gov)

55. From there, the Defendants began to fast-track and become more and more set in their representations to the public that nothing was wrong with East Palestine water or air quality as if they could just sweep a disaster under the rug that still poses a significant short and long-term risk to Ohio residents.

### *A Farce or Just Incompetence?*

56. Both EPAs testing of water and air around East Palestine was, and continue to be, seriously flawed.

57. The EPAs employed what is known as real time air monitoring and surface sampling through Photoionization Detectors (PID). These tests are instantaneous readings that measure the exposure of many chemicals collectively rather than by specific contaminants.

58. PIDs are inadequate in the face of an environmental disaster like this. Each specific contaminant carries what is known as a exposure limit or a level at which they become hazardous to humans.

59. By collectively measuring air contamination, the EPAs refused to deploy the most reliable testing possible despite knowing that PIDs were inaccurate.

60. The EPAs also struck out on water testing by only testing water surfaces despite knowing that the most accurate data and the most critical contaminants are found in sediment because residual hydrocarbons settle there.

61. Upon information and belief, the EPAs' refusal was the product of their rush to minimize the political fallout of the derailment and deflect public pressure.

62. In occupational and emergency settings where the spilled and burned off chemicals at issue here are present, the proper way to monitor air qualify is to conduct personal air sampling over an 8-hour period known as a Time Weighted Average (TWA).

63. Testing for specific contaminants is the only true measure of determining whether air and water quality are safe for humans.

64. Additionally, the EPAs downplayed the effects of the "controlled burn." Burning the specific toxicants at issue here produces a deadly carcinogenic byproduct known as a dioxin.

65. Dioxins have an exceptional tenacity when it comes to them lingering in the environment.

66. Despite that, both EPAs have failed completely to conduct any testing for dioxins and have discontinued most of their critical air quality testing while telling residents that their homes are safe.

67. The EPAs' testing is a delicately staged farce or a stunning display of incompetence. Ohio residents are paying the price as residents report rashes, sore throats, nausea, and headaches within 30 minutes of returning home.

68. Sadly, if the Court does not intervene now, those reports may be for far more serious afflictions such as cancer in future years – all caused by the Defendants placing politics over public safety.

### *Courtney Fish's Plight*

69. Courtney Fish's home is 100 yards from the site of the derailment. After the Defendants gave the all-clear for her to return to her home, she did, but she quickly found it uninhabitable due to the unmistakable effects of chemicals.

70. When she hired a private contractor to take water and air samples on her property, a person that she believes upon information and belief is an independent contractor hired by Norfolk Southern or the EPAs entered her property without permission and attempted to interfere with the sampling.

71. Fish's home will likely be uninhabitable for months, if not years. As a divorced mom with young children, she will face a choice between remaining in her home or attempting to start life over again – a grim prospect due to her income and responsibilities.

72. Her plight does not stand alone. All similarly situated Ohio residents who must make incredibly important life decisions in the aftermath of the derailment and the destruction of their community will be looking to the Defendants to provide accurate and reliable assurances or warnings about their communities, not false hopes that expose them to greater danger.

## **COUNT ONE – STATE CREATION OF DANGER IN VIOLATION OF THE FOURTEENTH AMENDMENT**

73. Paragraphs 1 through 72 are hereby incorporated herein.

74. As a general rule, government officials such as the Defendants do not have a duty to protect an individual from harm. *See Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989).

75. The Sixth Circuit, however, follows most circuits in recognizing a state-created danger exception to this general rule, which allows Plaintiffs to assert substantive due process claims under the Fourteenth Amendment.

76. To state a claim under the state-created danger doctrine in the Sixth Circuit, the Plaintiffs must allege

>(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff.

*Estate of Smithers ex rel. Norris v. City of Flint*, 602 F.3d 758, 763 (6th Cir. 2010) (internal quotation marks and citations omitted).

77. The Plaintiff, Courtney Fish, and the members of We The Patriots USA, Inc. have a substantive due process right to enjoy their lives, liberties, and property free from government exposure to danger.

78. The Defendants have repeatedly committed affirmative acts by deliberately failing to conduct proper testing of air and water quality in and around East Palestine, Ohio and assuring Plaintiffs that it was safe for them to return home despite the fact that they knew or should have known that it was not safe for them to do so. Their actions increased, and are continuing to increase, the risk that the Plaintiffs would be exposed to extremely harmful chemicals that could result in their deaths and catastrophic long-term health issues.

79. The Defendants' acts increased the risk that the Plaintiffs would be exposed to the toxic chemicals that Norfolk Southern polluted their property with and assaulted them with.

80. The Plaintiffs and every other similarly situated East Palestine, Ohio resident stood at special risk of harm due to their close proximity to the derailment site and the much stronger contamination of their homes and properties.

81. The Defendants knew or should have known that the testing that they employed for this derailment was inadequate and would lead to them giving the Plaintiffs false assurances of safety.

82. The Defendants acted to deflect political pressure in derogation of the Plaintiffs' lives and health.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs respectfully ask the Court for the following relief:

A. A declaratory judgment finding that the Defendants have engaged in conduct that is a state-created danger to the Plaintiffs and all similarly situated residents of East Palestine, Ohio and the surrounding communities.

B. A writ of mandamus ordering the Defendants to conduct industry standard occupational contaminant testing.

C. An injunction barring the Defendants from providing the residents of East Palestine, Ohio and the surrounding areas with false assurances that the air and water quality in their communities is safe until such time as it is shown to be safe by industry-standard occupational contaminant testing.

D. Costs and attorneys' fees.

E. Any such other and further relief that the Court deems necessary and proper.

      *//s//  Eric S. McDaniel*
ERIC S. MCDANIEL (00090827)
Malyuk McDaniel Kasper LLC
138 Stow Avenue
Cuyahoga Falls, Ohio  44221
(330) 929-9700
eric@malyuk.com


      *//s//  Cameron L. Atkinson*
Cameron L. Atkinson, Esq.
    *Pro hac vice motion forthcoming*
ATKINSON LAW, LLC
122 Litchfield Rd., Ste. 2
P.O. Box 340
Harwinton, CT 06791
Telephone: 203.677.0782
Email: catkinson@atkinsonlawfirm.com