UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| WE THE PATRIOTS USA, INC., *et al.*, | ) ) ) | CASE NO. 4:23-cv-00382 |
| | ) ) | JUDGE DAVID A. RUIZ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **MEMORANDUM OPINION & ORDER** |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, *et al.*, | ) ) ) ) | |
| Defendants. | ) | |

Plaintiffs We the Patriots USA, Inc.[1] and Courtney Fish, represented by counsel, filed a complaint for declaratory and injunctive relief or, in the alternative, for a writ of mandamus against federal and Ohio officials for failing to take adequate steps to protect the public from the consequences of the toxic chemical spill that occurred in East Palestine, Ohio on February 3, 2023. (R. 1 at ¶1). Multiple other parties have filed class actions consolidated before a sister court.

Here, Plaintiffs' sole cause of action alleges a state-created danger in violation of the

---

[1] According to the Complaint, Plaintiff We The Patriots USA, Inc. is a nonprofit public charity dedicated to promoting environmental safety, whose members include Ohio and Pennsylvania residents affected by the matters complained of in the Complaint. (R. 1, PageID# 2. ¶2).

Fourteenth Amendment of the United States' Constitution. (R. 1 at ¶¶73-82). Defendants Mike DeWine, Governor of the State of Ohio, and Ann Vogel, Director of Ohio's Environmental Protection Agency (OHEPA), are sued in their official capacities only. (R. 1, PageID# 2, ¶¶6-7). Defendants DeWine and Vogel filed a motion pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) for an order dismissing Plaintiffs' Complaint. (R. 14) Plaintiffs oppose said motion (R. 17) and Defendants have filed a reply in support of their motion. (R. 18).

The remaining Defendants[2] have also moved to dismiss Plaintiffs' Complaint for failure to state a claim. (R. 19). This latter motion is not addressed herein but rather by separate order.

## I. Factual Allegations

On February 3, 2023, a Norfolk Southern freight train derailed in East Palestine, Ohio. (Complaint, R. 1, PageID # 3, ¶11). The train included 20 cars containing toxic materials such as chloroethene, butyl acrylate, 2-ethyhexyl acrylate, ethylene glycol monobutyl ether, isobutylene, and benzene residue. (*Id*. at ¶10). The derailment caused some of the cars carrying the toxic materials to catch fire and burn for three days, as well as spilling chemicals into local waterways. (*Id.* at ¶¶ 11-13).

The United States EPA and Ohio EPA indicated on February 4, 2023, that they would respond to the derailment, and began air monitoring for volatile organic compounds (VOCs), including vinyl chloride and butyl acrylate. (R. 1, PageID # 7, ¶¶ 37-38). It is further alleged that both the federal and state EPAs used contractors to install various devices such as booms and underflow dams to restrict the flow of contaminated water. (*Id*. at ¶ 39). "Officials issued a shelter-in-place order for the entire town of East Palestine, affecting roughly 5,000 people, and

---

[2] The remaining Defendants are the United States Environmental Protection Agency ("U.S. EPA") and Michael Regan, in his official capacity as Administrator of the U.S. EPA. (R. 1).

2

an evacuation order was put in effect within a mile of the train derailment at 1020 East Taggart Street as of early Saturday, February 4, 2023." (R. 1, PageID #4, ¶16).

"On February 5, 2023, Defendant DeWine activated the Ohio National Guard to assist East Palestine authorities. Officials then issued a shelter-in-place order for the entire town of East Palestine and an evacuation order for people living within a mile radius of the train crash because of the risk of an explosion." (R. 1, PageID# 7, ¶40). "At this juncture, the EPAs reported that their community air monitoring readings did not detect any contaminants of concern. They also reported that the East Palestine water treatment plant confirmed that its water was not contaminated." (*Id*. at ¶41).

The Complaint avers that on the afternoon of February 6, 2023, emergency crews began a controlled burn of several cars, in a process known as a controlled release, resulting in "a large plume of thick black smoke in the form of a mushroom cloud" that released toxic chemicals into the atmosphere, soil, and nearby water sources. (R. 1, PageID# 4-5, ¶¶18-23).

On February 7, 2023, the federal and state EPAs informed the public that while they might smell chemical odors, they should not be concerned as the released chemicals had low odor thresholds. "In other words, a person could smell them before they posed a serious health risk." (R. 1, PageID# 8, ¶43). It is Plaintiffs' position that this statement was "blatantly inaccurate" and designed to alleviate public and political pressure. (*Id*. at ¶44). It is also Plaintiff's position that "[b]oth EPAs testing of water and air around East Palestine was, and continue to be, seriously flawed." (*Id*. at ¶56). Specifically, the Complaint asserts that the EPAs tested only water surfaces "despite knowing that the most accurate data and the most critical contaminants are found in sediment because residual hydrocarbons settle there." (*Id*. at ¶60). It is further alleged that the EPAs "refused to deploy the most reliable testing possible…." (Id. at ¶

3

59). "By February 8, 2023, state officials lifted the evacuation order after both EPAs reported that their overnight water testing showed that it was safe to drink and uncontaminated." (R. 1, PageID# 8, ¶46).

On February 15, 2023, Defendant DeWine issued a press release stating that East Palestine water was safe to drink according to the OHEPA. (R. 1, PageID# 9, ¶52). On February 16, 2023, Defendant Regan and Defendant DeWine toasted with a local homeowner with water from her tap. (R. 1, PageID# 9, ¶54).

On February 21, 2023, the U.S. EPA, through a delegation of authority from the President of the United States under the Comprehensive Environmental Response Compensation, and Liability Act (CERCLA), issued a "Unilateral Administrative Order for Removal Actions" (hereafter "Removal Order") in response to the East Palestine derailment. (R. 19-2, PageID# 187-263; Exh. A).

The Removal Order "pertains to property located at the Rail Line east northeast of the intersection of East Taggart Street and North Pleasant Drive (Latitude: 40.8360395; Longitude: 80.5222838) in East Palestine, Ohio (the "East Palestine Train Derailment Site") …. In addition to the response actions that are currently occurring, this Order requires Respondent to conduct removal actions described herein to abate an imminent and substantial endangerment to the public health or welfare or the environment that may be presented by the actual or threatened release of hazardous substances at or from the Site." (R. 19-2, PageID# 189, ¶2). The Removal Order included a number of concerns such as "actual or potential contamination of drinking water supplies or sensitive ecosystems" and "high levels of hazardous substances and pollutants or contaminants in soils largely at or near the surface, that may migrate." (R. 19-2, PageID# 198, ¶25(g)(2) & (g)(4)). The Removal Order requires Respondent to develop and implement "an air

4

monitoring and sampling plan" and "a plan for the identification and delineation of the extent of contamination for: (1) Surface and subsurface soils; (2) Surface waters and sediments; (3) Groundwater; [and] (4) Drinking water sources[.]" (R. 19-2, PageID# 202, ¶36(c) & (d)). The EPA may "approve, disapprove, require revisions to, or modify the draft Removal Work Plan in whole or in part." (*Id*. at PageID# 203, ¶38(b)).

The Complaint seeks "[a] declaratory judgment finding that the Defendants have engaged in conduct that is a state-created danger to the Plaintiffs and all similarly situated residents of East Palestine, Ohio and the surrounding communities." (R. 1, PageID# 14). Plaintiffs also seek a writ of mandamus ordering Defendants to conduct alternative contaminant testing, as well as seeking an injunction "barring the Defendants from providing the residents of East Palestine, Ohio and the surrounding areas with false assurances that the air and water quality in their communities is safe until such time as it is shown to be safe by industry standard occupational contaminant testing." (*Id*.) The Federal Defendants contend that Plaintiffs effectively seek to alter their removal plan under CERCLA and disrupt its execution. (R. 19-1, PageID# 175).

## II. Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6) Standards

When ruling upon a motion to dismiss filed under Fed. R. Civ. P. 12(b)(6), a court must accept as true all the factual allegations contained in the complaint. *See Erickson v. Pardus*, 551 U.S. 89, 93-94, 127 S. Ct. 2197, 167 L. Ed. 2d 1081 (2007); *accord Streater v. Cox*, 336 Fed. App'x 470, 474 (6th Cir. 2009). Nonetheless, a court need not accept conclusions of law as true:

> Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." As the Court held in [*Bell Atlantic Corp. v.*] *Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands more than an unadorned, the-

5

>  defendant-unlawfully-harmed-me accusation. *Id.*, at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (*citing Papasan v. Allain*, 478 U.S. 265, 286, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.*, at 557, 127 S. Ct. 1955, 167 L. Ed. 2d 929.
>
>  To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.*, at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.*, at 557, 127 S.Ct. 1955 (brackets omitted).

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)).

Federal courts are courts of "limited jurisdiction," and "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citations omitted). "It is to be presumed that a cause lies outside this limited jurisdiction … and the burden of establishing the contrary rests upon the party asserting jurisdiction." *Id*.

"Motions to dismiss for lack of subject matter jurisdiction fall into two general categories: facial attacks and factual attacks." *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994); *accord Beiersdorfer v. LaRose*, No. 20-3557, 2021 WL 3702211, at *5 (6th Cir. Aug. 20, 2021). Where a defendant mounts a facial attack that "questions merely the sufficiency of the pleading," a district court must accept all allegations as true, but "conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss."

6

*Rote v. Zel Custom Mfg. LLC*, 816 F.3d 383, 387 (6th Cir. 2016) (quotation marks and internal citations omitted).

"A *factual* attack, on the other hand, is not a challenge to the sufficiency of the pleading's allegations, but a challenge to the factual existence of subject matter jurisdiction. On such a motion, no presumptive truthfulness applies to the factual allegations, *see Ohio Nat'l Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990), and the court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Ritchie*, 15 F.3d at 598. "When examining a factual attack under Rule 12(b)(1), 'the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction.'" *Glob. Tech., Inc. v. Yubei (XinXiang) Power Steering Sys. Co.*, 807 F.3d 806, 810 (6th Cir. 2015) (citation omitted).

### III. Analysis

#### A. Standing and Group Pleading

Defendants assert that Plaintiff We the Patriots (WTP) cannot bring the claim it asserts because it lacks standing to sue. Specifically, Defendants assert that WTP lacks "a sufficiently concrete and redressable interest in the dispute." (R. 14, PageID# 104, *quoting Fieger v. Mich. Supreme Court*, 553 F.3d 955, 961 (6th Cir. 2009); *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (*en banc*)). Plaintiffs' brief in opposition concedes that their pleading is factually insufficient to demonstrate standing in an organizational and a representative capacity. (R. 17, PageID# 145). Plaintiffs indicate that they "will seek the Court's leave to amend to cure that deficiency" with respect to WTP, but have not sought any such leave to this date.

Defendants also assert that the Complaint fails to satisfy the pleading standards of Federal Rule of Civil Procedure 8, which is designed to give "defendant[s] fair notice of what the

7

. . . claim is and the grounds upon which it rests." (R. 14, PageID# 107, *quoting Twombly*, 550 U.S. at 548). Specifically, Defendants aver that the Complaint lumps "all defendants together in each claim and provid[es] no factual basis to distinguish their conduct…." (*Id*. at PageID# 107-108, *quoting Marcilis v. Twp. of Redford*, 693 F.3d 589, 596 (6th Cir. 2012); *Atuahene v. City of Hartford*, 10 Fed. App'x 22, 24 (2d Cir. 2001)). Plaintiffs counter that because they are not seeking damages but only equitable relief against defendants in their official capacity, the heightened particularity rule does not apply. (R. 17, PageID# 147).

Because the Court finds Plaintiffs have failed to allege an actionable substantive due process claim, as explained *infra*, the Court declines to address these issues in the interest of judicial economy.

**B. State-Created Danger Claim**

The Ohio Defendants have argued that Plaintiffs fail to state a valid substantive due process claim under the state-created danger doctrine. (R. 14, PageID# 108-109). Specifically, Defendants contend that Plaintiffs' theory—that the State Defendants' assurances that it was safe for residents to return home and/or consume local tap water was based on flawed testing methods—fails to state a claim as a matter of law. *Id*. Plaintiffs counter that the Ohio Defendants' alleged "affirmative acts" created or increased the risk of harm. (R. 17, PageID# 149-155).

Plaintiffs conceded that "[t]he Fourteenth Amendment's due process clause does not impose, as a general rule, a duty on government officials to protect an individual from harm." (R. 17, PageID# 148, *citing Deshaney v. Winnebago County Dept. of Social Services*, 489 U.S. 189 (1989)). Indeed, "the Constitution does not empower federal judges to remedy every situation we find heart-wrenching." *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925, 928 (6th

Cir. 2020). However, the Sixth Circuit Court of Appeals has held that "while the state generally does not shoulder an affirmative duty to protect its citizens from private acts of violence, it may not cause or greatly increase the risk of harm to its citizens without due process of law through its own affirmative acts. Although our circuit has never held the state or a state actor liable under the Fourteenth Amendment for private acts of violence, we nevertheless have recognized the possibility of doing so under the state-created-danger theory." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998).

To bring a "state created danger" claim, an individual must show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." *Jones v. Reynolds*, 438 F.3d 685, 690 (6th Cir. 2006) (*citing Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003)); *accord Vidovic v. Mentor City Sch. Dist.*, 921 F. Supp.2d 775, 792 (N.D. Ohio 2013) ("This is a particularly demanding standard requiring that the state's affirmative action exposed the plaintiff to a danger she wasn't already subject to.")

> [T]he Supreme Court has held that an executive actor's conduct violates the Due Process Clause only if it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." [*County of Sacramento v.*] *Lewis*, 523 U.S. at 847 n.8, 118 S.Ct. 1708. These colorful descriptors may be "more than a little 'open-ended.' " *Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 (10th Cir. 2015) (Gorsuch, J.) (citation omitted). But they at least, "as Judge Friendly put it, 'poin[t] the way' ": only extreme misconduct will violate the clause. *Lewis*, 523 U.S. at 847, 118 S.Ct. 1708 (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). To offer clearer guidance, the Court has placed this shocks-the-conscience test within tort law's traditional "spectrum of culpability." *Id*. at 848, 118 S.Ct. 1708. On one end, negligent conduct will never shock society's conscience. *Daniels*, 474 U.S. at 328, 106 S.Ct. 662. On the other, conduct unjustifiably "intended to injure" is the "most likely to rise to the conscience-

9

shocking level."

*Doe*, 954 F.3d at 933.

### 1. Affirmative Act That Created or Increased a Risk

First, Plaintiffs concede that Defendants DeWine and Vogel did not cause the chemical contamination or "take any acts that altered the chemical contamination in the environment of East Palestine, Ohio." (R. 17, PageID# 149-150). There are no allegations in the Complaint that support a finding that the Ohio Defendants *created* the danger at issue. Thus, resolution of this element revolves around the issue of whether the Ohio Defendants engaged in any affirmative acts that increased the risk of harm to Plaintiffs.

Plaintiffs aver that "it is unclear at this stage of the litigation who exactly ordered residents to evacuate from the area within a mile of the train derailment on February 4, 2023." *Id*. Plaintiff Fish concedes that she did leave the area after the derailment. (R. 17, PageID# 150). It is unclear whether any of the members of WTP live in the immediate vicinity of the derailment. In any event, there is no allegation that any residents, let alone Plaintiffs, were ordered to return to their homes. Rather, Plaintiffs contend that the Ohio Defendants, through their public representations, "*persuaded* the Plaintiffs to go against their better judgment and return [home]" *Id*. (emphasis added).

The Court agrees with Defendants that Plaintiffs have not sufficiently alleged that the State Defendants committed an "affirmative act" as that term is understood under the state-created danger theory. Tellingly, Plaintiffs' brief is nearly devoid of any authority on this issue, and does not cite a single case suggesting that a statement by a government official—even if said statement turns out to be inaccurate—constitutes an affirmative act in the state-created danger context. While it is admittedly difficult to find a case that is factually analogous to the situation

10

alleged herein, the Supreme Court has found that a government entity is *not* liable where a plaintiff was "in no worse position than that in which he would have been had [the State] not acted at all." *DeShaney*, 489 U.S. at 201; *accord Cartwright v. City of Marine City*, 336 F.3d 487, 493 (6th Cir. 2003) ("The question is not whether the victim was safer *during* the state action, but whether he was safer *before* the state action than he was *after* it.") (emphasis in original)); *McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 466 (6th Cir. 2006) (same). To the extent any of WTP's members lived in the immediate vicinity but never left the area, such individuals were in no worse position than that in which they would have been had the Ohio Defendants not acted at all or made any statements at all.

      Plaintiff Fish, who left the vicinity only to return later of her own volition and without any *compulsion* from the State, also fails to state a claim. It is not alleged that Plaintiff Fish was placed in the allegedly dangerous area by state officials, rather only that she was *persuaded* to return "against [her] better judgment." (R. 17, PageID# 150). Though not entirely analogous, this does bear some resemblance to the facts in *Bukowski v. City of Akron*, 326 F.3d 702, 706 (6th Cir. 2003), where the Court of Appeals found it "difficult to characterize the actions of the officials as affirmative acts within the meaning of *DeShaney*[,] [as] [t]he officials arguably did nothing to increase Bukowski's vulnerability to danger" where they merely returned her, *at her own request no less*, to her eventual assailant's residence—the place where they originally had found her. Here too, the Court cannot characterize the Ohio Defendants' statements as affirmative acts within the meaning of *DeShaney* where Plaintiff left the vicinity of the accident and returned to her home of her own free will. Arguably, there is even less state action herein than in *Bukowski*, where the state officials actually transported the plaintiff back to the place of danger. Plaintiff Fish's assertion that she was convinced to return by the statements of the Ohio

11

Defendants must be accepted as true at this stage of the proceedings. However, this Court need not accept as true Plaintiff's legal conclusion that the Ohio defendants' statements constituted an affirmative act under the state-created danger theory.

The danger at the root of this action—the exposure to fumes or chemicals at levels that could conceivably endanger the health of individuals exposed to it—was not created by any of the Defendants. Further, most of the case law speaks of an affirmative act as an act where the State created the risk of violence or increased the risk that the plaintiff would be exposed to an act of violence by a third party. Assuming *arguendo* that the state-created danger doctrine applies to the environmental risk at issue here, it is implausible to allege that the statements and/or actions of the Ohio Defendants *increased* the environmental risk caused by the chemical spill. Plaintiffs' argument—that they would not have returned to their homes had the Ohio Defendants not assured them that it was safe to do so—is too circuitous because, *inter alia*, the assurances by the Ohio Defendants did not increase an underlying danger even if they impacted the possibility that residents would return and/or or drink the tap water.[3]

Defendants identify cases from other districts that found a failure to provide a safe environment is insufficient to state a substantive due process claim under the state created danger theory. *See, e.g., Paige v. N.Y.C. Hous. Auth.*, 2018 U.S. Dist. LEXIS 137238, at *32 (S.D.N.Y. Aug. 14, 2018). In *Paige*, however, the court noted that the plaintiffs' allegation—that the Defendants acted affirmatively by failing to disclose what they knew and assuring the public that they were in compliance with lead paint regulations—was not an affirmative act, explaining that the alleged "deception did not cause Plaintiffs injuries—the presence of lead paint in Plaintiffs'

---

[3] Whether the tap water was safe to consume is an issue of fact that the Court cannot resolve on a motion to dismiss.

apartments did. At bottom, Plaintiffs assert a failure to take action, which cannot be transformed into an affirmative act." *Id.*; *see also Walker v. City of E. Chicago*, 2017 U.S. Dist. LEXIS 160729, at *14 (N.D. Ind. Sept. 29, 2017) (dismissing a state-created danger claim arising from lead and arsenic in public housing, where plaintiffs alleged that a public official promised safe housing while knowing of dangers posed by the contaminants).

The Court finds that the Ohio Defendants' assurances, even if ultimately inaccurate or based on poor or inadequate testing methodology, does not rise to the level of an "affirmative act" as that term is generally understood in case law. To find otherwise would greatly expand the state-created danger doctrine, and this Court declines to do so in the absence of any binding or persuasive authority.[4]

Finally, while the Court does not construe the Complaint or Plaintiffs' brief in opposition as alleging that Ohio Defendants' affirmative act was its failure to take proper actions in response to the derailment and ensuing chemical spill, Defendants correctly point out that "[a] failure to act is not an affirmative act under the state created danger theory." *Devine v. Sevel*, 2018 U.S. Dist. LEXIS 82753, at *13 (N.D. Ohio May 16, 2018) (citing *Cartwright*, 336 F.3d at 493).

**2. Second Element**

The second requisite element of a state-created danger claim is that the state's actions

---

[4] One court has expressly noted that that it has found no Sixth Circuit decision holding that "a misrepresentation or false statement (particularly falsely assuring that one will take action and then failing to act) is an 'affirmative act' under the state-created danger theory." *Feucht v. Triad Loc. Sch. Bd. of Educ.*, 425 F. Supp. 3d 914, 926 (S.D. Ohio 2019); *see also Meyers v. Cincinnati Bd. of Educ.*, 2019 WL 451355, at *2 (S.D. Ohio Feb. 5, 2019) ("the Sixth Circuit has not ruled on whether affirmative misrepresentations and concealment constitute affirmative acts.")

created a special danger to the plaintiff, *as distinguished from a risk that affects the public at large. See, e.g., Jones*, 438 F.3d at 690. In addition to establishing an affirmative act, "plaintiffs alleging a constitutional tort under § 1983 [are required] to show 'special danger' in the absence of a special relationship[5] between the state and either the victim or the private tortfeasor. The victim faces 'special danger' where the state's actions place the victim specifically at risk, as distinguished from a risk that affects the public at large." *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1066 (6th Cir. 1998); *accord Walker*, 535 Fed. App'x at 465 (6th Cir. 2013). "As with the affirmative act requirement, [the Sixth Circuit] ha[s] set a high bar for the special danger requirement." *McQueen*, 433 F.3d at 468.

In *Kallstrom*, the Sixth Circuit held a city's policy of freely releasing undercover officers' families' names, addresses, and phone numbers to the defense counsel of gang members created "a constitutionally cognizable 'special danger,' giving rise to liability under § 1983." 136 F.3d at 1067. Neither Plaintiff herein has identified any special danger to them resulting from the Ohio Defendants' actions separate and distinct from any danger to the general public. Plaintiff asserts that "[t]he people of East Palestine and the Plaintiffs are not the general public. They are but a small portion of the Ohio and Pennsylvania residents who have been exposed to toxic and deadly chemicals." (R. 17, PageID# 152). The Court disagrees. First, the people of East Palestine, as well as Ohio and Pennsylvania residents living in the vicinity of the derailment, are indeed the general public. Plaintiffs cite no authority for the proposition that the general public, in the context of state-created danger cases, must account for a whole state or even county, or wide

---

[5] There is no allegation that a special relationship exists between the Ohio Defendants and Plaintiffs, as may occur in situations where the State has custody of an individual such a state prisoner.

swaths of population. An entire town and its vicinity is indeed the general public.

Furthermore, this is not a class action suit. The Plaintiffs herein do not represent the people of East Palestine or those residents of Ohio and Pennsylvania living in the vicinity of the derailment. Rather, the Plaintiffs are a single resident of East Palestine and an organization interested in environmental safety. Neither is able to point to any special danger to which they were exposed that the general public—all the residents of the affected area—were not. Though not a perfect comparator, in *Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005), a ten-year old child's parents brought suit under a state-created danger theory after the child was killed by a speeding motorist in a residential area (residents had frequently complained of speeding vehicles), but the city had declined to lower the speed limit despite complaints. The *Schroder* court found that "the City's establishment of a 25 mile-per-hour speed limit and enforcement (or lack of enforcement) of that law did not create a 'special danger' to a discrete class of individuals (of which the Schroders' son was a member), as opposed to a general traffic risk to pedestrians and other automobiles." 412 F.3d at 729. Notably in *Schroeder*, the concept of the general public was not a large expanse of land or population of people, but simply other pedestrians or motorists in the area. Here too, neither Plaintiff Fish nor the WTP were confronted with a special danger that impacted them any differently than it did the general public.

Because Plaintiffs are not a discrete class of individuals who face a "special danger" caused by the Defendants, their state-created danger § 1983 action is untenable.

### 3. State Culpability

In order to establish a constitutional violation under the state-created danger theory, it is insufficient to allege that a "causal connection [exists] between state action and an act of private violence" because "the due process guarantee does not entail a body of constitutional law

15

imposing liability whenever someone cloaked with state authority causes harm." *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (*quoting County of Sacramento v. Lewis*, 523 U.S. 833, 848, 118 S.Ct. 1708 (1998)). Rather, the third element of constitutional violation predicated on a state-created danger theory requires a plaintiff to allege facts capable of showing that the state acted with the requisite culpability, which in the case of an exercise of the state's executive power, requires that the defendant's act(s) "shocks the conscience." *Ewolski,* 287 F.3d at 510.

The standard has several parts. First, an official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and the official must also draw the inference. *See Doe*, 954 F.3d at 933. Second, once the state official has drawn the inference, the official next must act or fail to act in a manner that demonstrates reckless or callous indifference toward the individual's rights. *Id*. The Sixth Circuit has discussed the requirements of this element in depth as follows:

> Our decisions have described this element in different ways. Sometimes we have said that a public official either "must have known or clearly should have known that [the official's] actions specifically endangered an individual." … Other times we have said that a public official must have "acted with the requisite culpability to establish a substantive due process violation[.]" ….
>
> Which test applies? The latter one more accurately articulates current law. A should-have-known framework comes close to "suggest[ing] a classic negligence formulation." … But a public official's negligence cannot prove a substantive-due-process violation even where the official directly inflicts the injury…. And our recent decisions using the should-have-known test have their roots in *Kallstrom*, a case predating the Supreme Court's *Lewis* decision…. Since *Lewis*, we have recognized that the culpability standard that applies to state actors who indirectly allow a private party to inflict harm should not be lower than the culpability standard that applies to state actors who directly inflict that harm themselves.
>
> This answer leads to another question: What is "the requisite culpability to establish a substantive due process violation"? The Supreme Court has told us that

> the Constitution sets a high bar for this sort of constitutional tort…. Here, as elsewhere, the Court has "been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." … It has long resisted turning due process into a "font of tort law."
>
> ***
>
> For these reasons, the Supreme Court has held that an executive actor's conduct violates the Due Process Clause only if it is "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8, 118 S.Ct. 1708…. [O]nly extreme misconduct will violate the clause…. To offer clearer guidance, the Court has placed this shocks-the-conscience test within tort law's traditional "spectrum of culpability." … On one end, negligent conduct will never shock society's conscience…. On the other, conduct unjustifiably "intended to injure" is the "most likely to rise to the conscience-shocking level."
>
> ***
>
> Our court has imported this deliberate-indifference standard into the state-created-danger context, at least when officials have " 'the opportunity for reflection and unhurried judgments.' " … The standard has two parts. An official must "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." … "Having drawn the inference," the official next must "act or fail to act in a manner demonstrating 'reckless or callous indifference' toward the individual's rights." … Given the call for caution in this area, … our cases set demanding rules for both parts of this standard.

*Doe*, 954 F.3d at 932–933 (internal citations omitted); *accord M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 449 (6th Cir. 2021) (culpability under the third prong of the state-created danger doctrine "requires a showing of at least deliberate indifference").

Plaintiffs assert that Defendants DeWine and Vogel issued statements that the air and water in East Palestine was safe, "when they knew it was not." (R. 17, PageID# 148, citing the Complaint at ¶¶ 46, 52-54, 81). Defendants counter that Plaintiffs' allegations are insufficient to establish this element. (R. 18, PageID# 162-164). The Court agrees. Paragraph 46 of the Complaint merely alleges that by February 8, 2023, "state officials lifted the evacuation order

after both EPAs reported that their overnight water testing showed that it was safe to drink and uncontaminated." (R. 1, PageID# 8). "On February 15, 2023, Defendant DeWine issued a press release stating that East Palestine water was safe to drink according to the OHEPA." *Id*. at PageID# 9, ¶52. Paragraph 53 of the Complaint states that despite the above statement, "the Defendants did not inform the public that potentially contaminated soil had yet to be removed and could still pose a risk of contamination of their drinking water." *Id*. at ¶9. Paragraph 54 refers to Defendant Regan, director of the U.S. EPA, and Defendant DeWine toasting with water from a local resident's tap. *Id*. Finally, paragraph 81 of the Complaint makes a conclusory allegation, without any substantiating factual allegations, that "[t]he Defendants knew or should have known that the testing that they employed for this derailment was inadequate and would lead to them giving the Plaintiffs false assurances of safety." (R. 1, PageID# 14, ¶81).

These allegations, even construed as true, are insufficient, as they do not adequately allege that the Ohio Defendants knew (or were aware facts that would allow them to infer) that a substantial risk of serious harm exists. At best, Plaintiffs have alleged that the techniques employed by both EPAs were not the best or most reliable testing techniques. Even if the Court were to assume that the moving Defendants were aware facts that would allow them to infer that a substantial risk of harm persisted, Plaintiffs fail to point to any factual allegations in the Complaint that either of the State Defendants drew such an inference. *See Doe*, 954 F.3d at 934 ("a public official must know of more than a general risk of harm. The official must know of the specific risk that later develops.")

Even if the first half of this element were deemed sufficiently pled, Plaintiffs have failed to allege with any factual specificity that the Ohio Defendants acted or failed to act in a manner that demonstrates reckless or callous indifference towards Plaintiffs' rights. The Sixth Circuit has

observed that "[f]or us to find deliberate indifference … we must find not only that the governmental actor chose to act (or failed to act) despite a subjective awareness of substantial risk of serious injury, but we also must make some assessment that he did not act in furtherance of a countervailing governmental purpose that justified taking that risk." *Hunt v. Sycamore Cmty. Sch. Dist. Bd. of Educ.*, 542 F.3d 529, 541–42 (6th Cir. 2008) ("Thus, even where the governmental actor is subjectively aware of a substantial risk of serious harm, we will be unlikely to find deliberate indifference if his action was motivated by a countervailing, legitimate governmental purpose.") The Complaint has not sufficiently pleaded any "conscience shocking" action by the Ohio Defendants.

Therefore, Plaintiffs have failed to allege facts capable of satisfying the requisite third element of their claim.

### C. Mandamus Claim

Finally, Defendants argue that Plaintiffs fail to state a valid mandamus claim under 28 U.S.C. § 1651(A), which provides, "[t]he Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." (R. 14, PageID# 116). However, Defendants argue that "[a] writ of mandamus is an extraordinary remedy, and is intended to provide a remedy only if the plaintiff has exhausted all other avenues of relief and the defendant owes the plaintiff a clear nondiscretionary duty." (*Id.*, *quoting O'Georgia v. U.S. Dep't of Justice*, 370 F. Supp. 2d 657, 659 (N.D. Ohio 2005); *Willis v. Sullivan*, 931 F.2d 390, 395 (6th Cir. 1991)).

Plaintiffs' response indicates that they did not plead an independent mandamus claim under the All Writs Act, 28 U.S. § 1651. (R. 17, PageID# 156). Instead, they concede that they have alleged only one cause of action, which the Court has found fails to state a claim, and seek

mandamus only as a form of relief. (R. 17, PageID# 155-156). Therefore, this issue is moot.

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss (R. 14) is hereby GRANTED.

IT IS SO ORDERED.

*s/ David A. Ruiz*
David A. Ruiz
United States District Judge

Date: September 25, 2024